# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

Regina Barken,

                Plaintiff,

                                      Case No. 22cv783-JPS

      v.

Detective Michael Sarenac,
Detective Kent Gordon,
Detective James Jordan,
Detective Raena Vrtochnick,
and Lieutenant Troy Jankowski.

Each in his or her individual capacity,

                Defendants.

---

# FIRST AMENDED COMPLAINT

---

## I. NATURE OF ACTION

Regina Barken brings this civil action under Title 42 U.S.C. §1983 against

Milwaukee Police Department Detectives Michael Sarenac, Kent Gordon, James

Jordan, Raena Vrtochnick, and Lieutenant Troy Jankowski in order to obtain

monetary damages for injuries arising from the deprivation of rights secured to her by

the Fourth and Fourteenth Amendments to the Constitution of the United States of

America.

## II. JURISDICTION AND VENUE

### A.    Jurisdiction

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331

(federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (42 U.S.C. § 1983

jurisdiction).

### B    Venue

202. The Eastern District of Wisconsin is the proper venue for this action because

the Plaintiff's claims arose within the geographical boundaries of the Eastern District of

Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III. PARTIES

### A.    Plaintiff

301. The Plaintiff Regina Barken is an adult resident of the State of Wisconsin.

### B    Defendants

302. On information and belief, Defendant Michael Sarenac is an adult resident

of the State of Wisconsin.

303.  At all times material to this lawsuit, Defendant Sarenac was employed by the

Milwaukee Police Department.

304.  At all times material to this lawsuit, in regard to the conduct complained of

herein, Defendant Sarenac was acting within the scope of his employment.

305. At all times material to this lawsuit, in regard to the conduct complained of

herein, Defendant Sarenac was acting under color of state law.

306. On information and belief, Defendant James Jordan is an adult resident of the State of Wisconsin.

307. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Jordan was employed by the Milwaukee Police Department.

308. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Jordan was acting within the scope of his employment.

309. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Jordan was acting under color of state law.

310. On information and belief, Defendant Kent Gordon is an adult resident of the State of Wisconsin.

311. At all times material to this lawsuit, Defendant Gordon was employed by the Milwaukee Police Department.

312. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Gordon was acting within the scope of his employment.

313. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Gordon was acting under color of state law.

314. On information and belief, Defendant Raena Vrtochnick is an adult resident of the State of Wisconsin.

315. At all times material to this lawsuit, Defendant Vrtochnick was employed by

the Milwaukee Police Department.

316. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Vrtochnick was acting within the scope of her employment.

317. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Vrtochnick was acting under color of state law.

318. On information and belief, Defendant Troy Jankowski is an adult resident of the State of Wisconsin.

319. At all times material to this lawsuit, Defendant Jankowski was employed by the Milwaukee Police Department.

320. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Jankowski was acting within the scope of his employment.

321. At all times material to this lawsuit, in regard to the conduct complained of herein, Defendant Jankowski was acting under color of state law.

## IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401. On or around Thursday, June 4, 2020, Plaintiff Barken suffered one of the worst tragedies a human can endure – a child whom she helped raise and considered her son (though he was not her biological offspring) was murdered.

402. Police referred to the homicide victim as Ms. Barken's "stepson," so that terminology will be used throughout the remainder of the Complaint.

403. Milwaukee detectives went to Froedtert Memorial Lutheran Hospital in

Milwaukee to collect some information, and did collect information from the murdered boy's loved ones who had gathered at the hospital, including Plaintiff Barken.

404.    Detective Vrtochnick reported, on or around November 4, 2020, in a recorded interview, that on June 4, 2020, she was working with Detective Sarenac, and while "at Froedtert Hospital interviewing a victim, we came in contact with the family of a second victim who informed us that Ms. Barken, who was located in the Center for Advanced Care, possibly had information regarding a possible suspect."

405.    Plaintiff Barken was cooperative with the detectives.

406.    Plaintiff Barken offered the information that she believed a particular person had been "beefing" with her stepson, and had previously made a verbal threat to kill her stepson, so Ms. Barken wanted this person investigated as a possible suspect in the murder.

407.    Plaintiff Barken further offered that she had an old cell phone at her house that she would give to police to see if they could retrieve a recording of the conversation where this person threatened to kill her stepson.

408.    Plaintiff Barken gave the detectives permission to stop by her home to pick up the cell phone.

409.    Plaintiff Barken hoped that information from the cell phone could be retrieved by the police IT experts and that it would assist police in solving the murder.

410.    Detective Vrtochnick reported in her recorded interview[1] referenced above, that Ms. Barken "was interviewed by Detective Sarenac at Froedtert at the Center for Advanced Care and she informed him that she had a cell phone at her house that would have information that could possibly help develop who the suspect is – actually a homicide investigation – who the, [sic] who a potential suspect and a motive could be."

411.    Detective Vrtochnick reported that, "We informed Lt. Troy Jankowski that we now had additional witnesses including Ms. Barken at the hospital, informed him that she had this phone at her residence, and that we would be following Ms. Barken to her residence to retrieve the phone.  The reason that we would be following Ms. Barken was that she did not want – she was cooperative – but she did not want to get into our squad car at the hospital and have all of the family see her basically talking to the police."

412.    Detective Vrtochnick reported that Lt. Jankowski told her and Detective Sarenac not to follow her to her residence, and instead, "she needed to drive with us to her residence in our squad.  Mike and, or I'm sorry, Detective Sarenac and him got into a disagreement about that and he tried to explain to her [sic] that she was being cooperative.  And, he ordered Detective Sarenac and I to arrest her if she did not get in

---

[1] Moving forward, where Plaintiff says "Vrtochnick reported" without qualification, Plaintiff is referring to this November 4, 2020, recorded interview, produced in discovery in this case on or around 9/21/22.

our car and let us take her to get her cell phone. He said that we needed to call for a uniformed squad to meet us at the hospital."

413. Detective Vrtochnick reported that they called for a uniformed squad, but after waiting for almost an hour, "Detective Sarenac and I decided that we weren't going to wait for a squad any longer – she remained cooperative – and that we were going to be doing this this way to retrieve the phone."

414. Detectives Sarenac and Vrtochnick were privileged to disobey any unlawful order, such as the order Lt. Jankowski had given to arrest Ms. Barken for obstructing when, in fact, she was being cooperative.

415. The detectives decided they would not be obeying Lt. Jankowski's order.

416. The detectives informed Lt. Jankowski that they would be doing what they had initially wanted to do, which was to simply follow Ms. Barken – a cooperative victim/witness – to her home to retrieve the phone she was offering to give them.

417. Detective Vrtochnick reported that Lt. Jankowski "was very angry that he, that we decided that we were not going to follow his order, and that we were going to be doing this this way to retrieve the phone."

418. The detectives left the hospital and followed Ms. Barken to her residence.

419. Detective Vrtochnick reported that while they "were in route to her residence, Lt. Jankowski called one of us and said that [Ms. Barken] also needed to come down when we were done picking up the phone, we were going, she had to

come down to look at photographs."

420.    When Plaintiff Barken arrived at home, she saw that she had impromptu visitors who had heard through social connections that her stepson had died. These family members had shown up to comfort Plaintiff Barken and her children, and more were on their way.

421.    Defendants Detective Sarenec and Detective Vrtochnick arrived at Plaintiff Barken's home shortly after Plaintiff Barken arrived home.

422.    Plaintiff Barken turned over the cell phone to the detectives as promised and answered a few additional questions.

423.    The detectives then asked her to come down to the station to continue to help them solve the homicide by looking at some photos.

424.    Plaintiff Barken told the detectives she was willing to come to the station to look at their photos, but as she had already told police everything she could, she reasonably desired some time and space to grieve with her family at that point.

425.    It was nearing 5 p.m., and Ms. Barken expressed her strong desire to grieve with her family and support her living children in working through the trauma of the violent and unexpected loss of their brother.

426.    Plaintiff Barken requested that she be permitted to come down to the station to speak with police again at a more respectful time, such as the following day.

427.    Detectives Sarenac and Vrtochnick called Lt. Jankowski and told him that

Ms. Barken was not agreeing to come down to the station right then, but that she would come tomorrow.

428. Detective Vrtochnick reported, "When we get to her house, she remained cooperative, went inside of her house, got the phone, brought it to us, and I believe that, Lt. Jankowski called Detective Sarenac on his phone and Detective Sarenac explained to her [sic] in front of her residence, or explained to Lt. Jankowski in front of Ms. Barken's residence, that she's remaining cooperative, we have the phone, she'll come and look at photographs. She was agreeable to that. But, she did not want to come right then to do so."

429. Later, Detective Sarenac reported to Captain Carolyn Birch that Ms. Barken "was overall cooperative at first but was not willing to come downtown (PAB) at this time since she was with family and still grieving."

430. The Defendants knew that Ms. Barken was not an actual witness to the homicide.

431. The Defendants knew that Ms. Barken's involvement was that of a grieving stepmother, who had identified a possible suspect based on a history of "beefing" or "feuding" with her stepson, and who offered a cell phone to police with the hope that police could retrieve information that would help solve her stepson's murder.

432. Lt. Troy Jankowski nonetheless wanted Detectives Vrtochnick and

Sarenac to arrest Ms. Barken to get her to *immediately* come look at photos and possibly be interviewed by a homicide detective.

433. What Lt. Jankowski wanted was in violation of the Constitution, and all involved parties knew this fact.

434. Lt. Jankowski ordered Detectives Sarenac and Vrtochnick to arrest Ms. Barken for "obstruction" for not agreeing to come down to the police department *right then* to look at photos.

435. Detective Vrtochnick reported, "Lt. Jankowski for at least the third time ordered us to arrest her. Mike, he, he questioned the order, and argued with him about how we, we did not feel as though we should be arresting her for this, that she was cooperative."

436. The Defendants knew there was no legitimate reason to arrest Ms. Barken.

437. The Detectives knew that their Lieutenant was ordering them to conduct an unlawful arrest.

438. The Detectives had the ability to intervene and refuse to arrest, and to call the Chief of Police are report the unlawful order, but they failed to do so and instead proceeded with the unlawful arrest because Lt. Jankowski insisted that she look at photos at the police station *right then*.

439. Detective Vrtochnick reported that she "explained to Ms. Barken that I

was ordered to arrest her if she did not come down and talk to – I believe he wanted

her to talk to a homicide detective also – but I'm not sure about that but I did know that

he wanted her to come down and do photos.  I tried explaining to her the importance

of her coming down to do photos.  And, she did say that she would, just not at that

time."

440.    Without any probable cause to believe Ms. Barken had committed any

crime, Defendant Detectives Sarenac and Vrtochnick arrested Ms. Barken at that point

in front of her own home.

441.    Detective Vrtochnick reported, "I believe that the arrest itself was not

necessary," but that she arrested Ms. Barken because Lt. Jankowski told her to do so.

442.    Ms. Barken was forcefully handcuffed and held in the back of a squad car.

443.    Defendants Vrtochnick and Sarenac had Officers Jason Tate and

Nicholaus Waszak pull Plaintiff Barken, handcuffed, out of one squad car and into the

back of a transporting squad car in front of her home, with her grieving family and

some neighbors looking on all the while.

444.    Ms. Barken asked why it was she being arrested instead of the people

who had murdered her son.

445.    The transporting officer responded, on video, "A lot of this makes no

sense, I'm not gonna lie to you."

446.    During transport, on video, the officers repeatedly told Ms. Barken in

multiple ways that they had no idea why they were arresting her, other than that they were following orders and that someone "upstairs" wanted to speak with her.

447.    Initially, Officers Tate and Waszack took Plaintiff Barken to District 7, saying right in front of her, on video, that they had to get her in "the cage."

448.    When they arrived at District 7 with Plaintiff Barken, Officers Tate and Waszack learned that, instead, they were supposed to "bring her down to PAB."

449.    PAB is an acronym for Police Administration Building.

450.    During transport, Plaintiff Barken sobbed and asked how she could go from being a victim to being arrested in the back of a squad car.

451.    Plaintiff Barken continued to make it very clear that she told officers everything she knows and she did not want to talk to anybody else at this time.

452.    During transport, Officers Waszak and Tate discussed in front of Plaintiff Barken that they should just "drop her off and leave" because that would technically be in compliance with their order.

453.    There was sufficient time to submit an application for an arrest warrant for Ms. Barken if police had been so inclined, such as during the hour they were waiting for a uniformed squad at the hospital.

454.    There was no warrant authorizing the arrest of Ms. Barken.

455.    There was no probable cause to arrest Ms. Barken.

456.    No emergency circumstances necessitated the arrest of Ms. Barken

without a warrant.

457. In her recorded interview from November 4, 2020, Detective Vrtochnick had the following verbal exchange with the interviewer:

Interviewer: "In your opinion had she done anything to obstruct or resist your investigation?"

Det. Vrtochnick: "As far as the, the phone, no. As far as her coming to, to view photographs – and to be for, I, and, well, I, I don't wanna, I think they wanted her further interviewed when she got done here voluntarily, that would, that would be –

Interviewer: "And she was willing to do that, she just didn't want to do it right at that moment?"

Det. Vrtochnick: "Yes. What he was saying that if we let her go we won't be able to, what if, she might just you know go in the wind [trailing off/inaudible]."

458. The police arrested Ms. Barken solely to force her to speak with them, again, relating to their investigation of some other person's crime of homicide.

459. Ms. Barken was never a suspect in the homicide.

460. Ms. Barken was only a loved one of the victim of this horrendous crime.

461. Ms. Barken arrived at Milwaukee Municipal Building/Police Administration Building, where she was placed in a cell.

462. Meanwhile, Detectives Sarenac and Vrtochnick went back to the Criminal Investigation Bureau (CIB).

463. At CIB, Detective Vrtochnick informed Captain Thomas Casper "to make him aware of the situation because we didn't feel comfortable with what happened."

464. Detective Sarenac had the duty of filling out (or at least partially filling out) paperwork for the arrest, and getting it signed and notarized by a supervisor, who at the time and in this case, was a Lt. James Henner.

465. Lt. Henner concluded "there was insufficient probable cause to support a charge of Obstructing." (MPD Bates Stamped 9/21/22 Production 000191.)

466. Lt. Henner discussed his concerns Lt. David Larson, "and they agreed they were going to admin release BARKEN on the fact that the Obstructing charge was lacking and that **it was an unlawful arrest** when it came to that part of the investigation." (MPD Bates Stamped 9/21/22 Production 000193.) (emphasis added.)

467. "Upon making this determination, Lt. HENNER stated Lt. LARSON immediately signed off on the Administrative release of Ms. Barken." (MPD Bates Stamped 9/21/22 Production 000193-94.)

468. The administrative release was reportedly authorized under Wis. Stat. 968.08, allowing law enforcement to release a person in custody without appearing before a judge, "if the law enforcement officer is satisfied that there are insufficient grounds for the issuance of a criminal complaint against the person arrested."

469. This meant that there would be no judicial determination of probable cause for Ms. Barken, or any sort of judicial review of the arrest, at that time.

470. Therefore, following being "booked in at 5:17PM on June 4, 2020," Ms. Barken was administratively "released without charges at 8:04PM." (MPD Bates

Stamped 9/21/22 Production 000189.)

471.    However, after being "administratively released" at 8:04 p.m. due to the arrest lacking probable cause and being unlawful, Defendants did not actually release her, but unlawfully delayed her release and left her in the cell.

472.    About an hour and a half later, Defendants Gordon and Jordan "escorted Barken to the fourth floor of the Police Administration Building specifically room 424-C, equipped with Axon Evidence.com software which was used to record the interview."  (MPD Bates Stamped 9/21/22 Production 000219.)

473.    This "in custody interview of Regina A. Barken" began "at 9:32 pm and concluded at 1:20 am."  (MPD Bates Stamped 9/21/22 Production 000219.)

474.    Ms. Barken was interrogated by Detective James Jordan and Detective Kent Gordon.

475.    Detectives Jordan and Gordon knew there had not been probable cause for Ms. Barken's arrest, knew she had been administratively released without charges, and yet they continued to prolong her unlawful detention and failed to release her.

476.    Detective James Jordan was a homicide detective and he was interrogating Ms. Barken to investigate the homicide.

477.    Detective Kent Gordan was a robbery detective who had an existing professional law enforcement-citizen relationship with Ms. Barken based on her having provided information to him in a recent robbery investigation where her family had

been the victim of the robbery, and he was assisting in the interrogation of Ms. Barken to investigate the homicide.

478.    Ms. Barken, within the first few minutes of this interrogation, asked, "Why are you treating me like I'm the suspect. I'm in a grieving process and you should have never put me in this situation.  Let me get through this.  Let me come down later and talk to you," and she asked that they give her the respect of interviewing her on her time, instead of arresting her and forcing her to submit to interview at their pleasure.

479.    Detective Jordan informed Ms. Barken that she had been arrested for resisting/obstruction, and Detective Jordan said, "I apologize for that. I don't know who made that call. I'm sorry."

480.    The detective told Ms. Barken, "I wasn't there, I don't know why they arrested you, if they thought you were being evasive or uncooperative and that's why they did a resist/obstruct."

481.    Ms. Barken said, "I just want to get to my family.  My son is taking it hard.  I need to be with my kids.  I need to be with them.  And he shouldn't have to see his mom go to jail," and asked how she was "supposed to explain this" arrest in front of her home to her neighbors.

482.    The detectives told Ms. Barken they wanted to question her about her stepson's murder.

483.     In fact, her entire arrest had been pretext to gather evidence about her stepson's murder, a crime they knew she had not committed or abetted.

484.     Ms. Barken went on to explain, "We were at the hospital, I asked you if you needed more information, you said no.  I said I don't want to go to my house because I just moved there and I don't want neighbors seeing a bunch of police and that I'm the victim. This is very wrong, and I'm very upset, and I'm most definitely going to try to get a lawyer.  But go ahead with your questions, I'll tell you what I can, I already have."

485.     The detectives never told Ms. Barken they wanted to question her about any alleged crime they suspected *her* of committing, such as resisting or obstructing.

486.     The detectives assured her that she was not a suspect.

487.     One detective then read Ms. Barken her Miranda rights.

488.     Ms. Barken was confused as to how to respond to being read Miranda rights after being assured she was not a suspect, telling the detectives that she has never been in this situation, and that; "I feel again like I'm a suspect."

489.     The detectives conceded that the real purpose for arresting Ms. Barken and delaying her release was to interrogate her about the actual suspects believed to be connected to the murder of her son.

490.     The detectives told her that if she would just speak to them, they would make sure to get her on her way home as soon as possible.

491.    The detective told her, "Here's the thing.  Just because you were arrested and you're in custody talking to detectives.  I already told you what you were arrested for.  I'm assuming that you're probably not going to tell me after we start talking that you shot somebody, right?  You wouldn't hurt anybody, right?  You help people, right?  So really, you know the real reason we want to talk to you is we want to get closer to finding out who killed your son.  That's what this is."

492.    The detectives explained they were just reading Miranda rights because she was "technically" in custody and so they had to read the Miranda warning because "constitutional rights are still a real thing."

493.    Ms. Barken was never charged or cited with any offense in connection with this incident.

494.    The defendants had no interest in ensuring Ms. Barken's presence at trial because they were never going to bring any resisting/obstruction charges against her.

495.    No charges against Ms. Barken were ever referred to the District Attorney in connection with this incident.

496.    Ms. Barken was finally released at approximately two in the morning, and was not even provided the courtesy of a ride home.

497.    The Defendants arrested and detained Plaintiff Barken because they wanted to force her to answer additional questions about potential suspects in her son's murder case, in intentional and reckless disregard for Ms. Barken's constitutional

rights.

## V. VIOLATIONS OF LAW

### A.  Fourth and Fourteenth Amendments

501. The Defendants conducted a warrantless seizure of and detained Ms. Barken without probable cause to believe that she had committed a crime, in violation of her constitutional right to be free of unreasonable seizures guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

502.   The Defendants excessively detained Ms. Barken after her arrest, and even after determining her arrest was unlawful, without obtaining or even attempting to obtain a judicial determination of probable cause, and the Defendants unreasonably delayed Ms. Barken's processing and release, for the purpose of gathering additional evidence about a crime which they knew Ms. Barken was not suspected of committing.

503.   Each of the Defendants knew that Ms. Barken's constitutional rights were being violated, and yet each of them intentionally failed to intervene to prevent Ms. Barken's unlawful arrest and detention, despite having a realistic opportunity to do so, and instead, facilitated these violations of her constitutional rights.

## VI. DAMAGES AND EQUITY

### A. Damages

601. By virtue of unlawful actions alleged above, the Plaintiff has suffered a loss of her right to be free from unreasonable searches and seizures.

602. The Plaintiff has also suffered loss of liberty, emotional distress, embarrassment, humiliation, loss of reputation, financial losses, pain and suffering, and other damages for which she should be compensated in an amount deemed just by the Court.

603. Because the acts of the individual Defendants that are alleged herein were carried out maliciously or with reckless disregard for the Plaintiff's fundamental rights, the Plaintiff seeks awards of punitive damages against the individual Defendants in amounts sufficient to deter them and other law enforcement officers from repeating such behavior in the future.

## VII.  CONDITIONS PRECEDENT

701. All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. DEMAND FOR JURY TRIAL

801. The Plaintiff hereby demands a trial by jury of all issues triable of right to a jury.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Ms. Barken prays that the Court grant judgment against the Defendants, awarding her:

901.  Monetary damages in an amount that will fairly compensate her for her injuries;

902.   Punitive damages in amounts that will deter the Defendants and other law enforcement officers from repeating such conduct in the future;

903.   Her costs, attorneys' fees, and litigation expenses as well as any further relief this Court deems just.

Dated this 26th day of September, 2022.

Respectfully submitted,
Regina Barken, Plaintiff,
By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar No. 1016284
ANDREA J. FARRELL
State Bar No. 1064773
1025 Quinn Dr., Suite 500
Waunakee, WI 53597
Phone:        (608) 283-6001
Facsimile:    (608) 283-0945
E-mail:        ajf@scofflaw.com

/s/Andrea J. Farrell
_____
ANDREA J. FARRELL
ATTORNEYS FOR PLAINTIFF