# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

REGINA BARKEN,

                        Plaintiff,

v.                                              Case No. 22-CV-783-JPS

MICHAEL SARENAC, KENT
GORDON, JAMES JORDAN, RAENA        **ORDER**
VRTOCHNICK, and TROY
JANKOWSKI,

                        Defendants.

---

## 1.      INTRODUCTION

In this action, Plaintiff Regina Barken ("Barken") asserts that Defendants Michael Sarenac ("Sarenac"), Kent Gordon ("Gordon"), James Jordan ("Jordan"), Raena Vrtochnick ("Vrtochnick"), and Troy Jankowski ("Jankowski") (collectively, "Defendants") violated her constitutional rights when they arrested and detained her. ECF No. 14. The case is now before the Court on Barken's and Defendants' cross-motions for summary judgment. ECF Nos. 70, 88. This case has been pending adjudication on the merits for nearly a year, with the delay attributable in significant part to counsels' repeated failure to comply with the Court's orders and to cooperate with one another.[1] This failure has made the Court's task in

---

[1] *See* Apr. 26, 2023 text order (denying cross-motions for summary judgment for failure to comply with Court's protocols); ECF No. 45 (same); ECF No. 49 (denying Barken's expedited motion for a partial summary judgment ruling); ECF No. 68 at 26–29 (recounting procedural history and again extending deadline to file summary judgment motions). Ultimately, observing the attorneys' pattern of mutual antagonism led the Court to realize that it would not be able to

taking up the parties' cross-motions needlessly difficult. In any event, the motions are now fully briefed. ECF Nos. 73, 78, 82, 89, 90, 91. As stated herein, Barken's motion for partial summary judgment will be granted, and Defendants' motion for summary judgment will be denied.

## 2.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). Where both parties move, "[t]he court applies the procedural requirements of Rule 56 separately to each cross motion for summary judgment." *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 997 (N.D. Ill. 2017) (citing *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015)). "Each movant and nonmovant 'must individually satisfy the requirements of Rule 56.'" *Id.* (quoting *United*

---

reach the merits of the case without relaxing somewhat its summary judgment protocols, to which it normally expects strict adherence. *See* Oct. 23, 2023 text order (denying Defendants' motion to strike Barken's motion for partial summary judgment); ECF No. 87 (granting Defendants leave to file motion for summary judgment). That the Court did so in this case does not grant either attorney in this case nor any other attorney appearing before the Court license to disregard the dispositive motion protocols in the future.

*Transp. Union v. Ill. Cent. R.R. Co.*, 998 F. Supp. 874, 880 (N.D. Ill. 1998)). "On one motion, the court views the facts and inferences in the light most favorable to the nonmovant; but if summary judgment is not warranted, the court changes tack on the cross motion and gives the unsuccessful movant 'all of the favorable factual inferences that it has just given to the movant's opponent.'" *Id.* at 997–98 (quoting *Hotel 71*, 778 F.3d at 603).

"At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). "Summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party." *Com. Underwriters Ins. Co. v. Aires Env't Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001) (citing *Wolf v. N.W. Ind. Symphony Soc.*, 250 F.3d 1136, 1141 (7th Cir. 2001)).

### 3.    RELEVANT FACTS

The development of the factual record has been a point of bitter contention throughout this litigation. *See supra* note 1 and accompanying text. The Court has pieced together the following relevant facts from the parties' respective fact submissions. ECF Nos. 72 (Barken's statement of facts), 76 (Defendants' statement, reproducing and responding to each item

in Barken's statement of facts). Unfortunately, the parties' submissions are more of an extended quarrel than a coherent narrative of the "who, what, when, and where" in this case. They omitted important contextualizing details from their statements—for example, the very basic, very central fact that Barken was indeed arrested and handcuffed outside of her home. Because of this, at times, the Court has sourced those contextualizing, undisputed details from the allegations in the operative complaint, ECF No. 14. At times, the Court has also consulted portions of the underlying record to which the parties have failed to cite in order to secure a full picture of the relevant events and/or testimony. *Cf. Swanigan v. City of Chicago*, 881 F.3d 577, 582 n.1 (7th Cir. 2018) (noting that "finding[s] taken from . . . prior proceeding[s] . . . not subject to reasonable dispute" may be subject to judicial notice (quoting *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1082 (7th Cir. 1997))); *Addis v. Holy Cross Heath Sys. Corp.*, No. 3:94 CV 118 AS, 1995 WL 914278, at *1 (N.D. Ind. July 6, 1995) ("This court takes full judicial notice of the massive and elaborate record in this case.").

Where the parties agree on a fact, the Court omits citation to their respective submissions; likewise, citations to undisputed contextualizing information drawn from the operative complaint are omitted. Where the parties disagree on the facts or the reasonable inferences to be drawn therefrom, or the Court otherwise draws from the underlying record, the Court includes such citations. Irrelevant or immaterial facts are omitted. At various times, both Barken and Defendants couch legal conclusions as "facts"; those so-called "facts" are instead addressed as legal arguments *infra* Section 4.

### 3.1 Background

On June 4, 2020 around 12:41 p.m., Barken's eighteen-year-old stepson, Baby Jeff,[2] was shot. He was taken to Froedtert Hospital in Milwaukee, as was another female victim of the shooting. He was pronounced dead at 2:07 p.m. Barken was at the hospital around the time of these events.

Sarenac and Vrtochnick—detectives with the Milwaukee Police Department ("MPD")—went to the hospital around 1:00 p.m. to investigate the double shooting, and at various times during this investigation were in contact with their supervisor, Jankowski, an MPD lieutenant. Jordan and Gordon, who interacted with Barken later, are also MPD detectives. None of the Defendants disputes that he or she was acting within the scope of his or her employment with MPD and under color of state law at the time of the events giving rise to this case.

As will be detailed further below, Sarenac and Vrtochnick interviewed Barken at the hospital about the shooting that killed Baby Jeff; she was later taken into custody and interrogated about the same. Barken was not an eyewitness to the homicide. The parties dispute whether she was a suspect in the homicide. Barken asserts that she was not a suspect in the homicide, citing the deposition of Gordon, one of the detectives who later questioned Barken in custody but who was not on-scene at the hospital. ECF No. 72 at 3 (citing ECF No. 53-1 at 14). Defendants respond that Jankowski—who was also not on-scene at the hospital nor present for Barken's in-custody interrogation—testified that it was "possible" that

---

[2]Baby Jeff was not Barken's biological stepson, but she helped raise him and considered him her son. The parties use the "stepson" terminology throughout their submissions, so the Court will do the same.

Barken was a suspect in the homicide "as party to a crime and facilitating," and that he had concerns that she might engage in retaliation for the homicide or in other crimes. ECF No. 76 at 3; ECF No. 53-2 at 25, 35. But as explained *infra* note 7, any dispute over whether Barken was a suspect in the homicide is neither genuine nor material.

### 3.2 Vrtochnick and Sarenac's Interview with the Surviving Victim

Upon arriving at the hospital, Sarenac and Vrtochnick met with the surviving female victim of the shooting. Vrtochnick testified at her deposition that this victim reported that she saw the person who, from a vehicle, pointed a gun at her and Baby Jeff while they were in Baby Jeff's vehicle. According to Vrtochnick, the victim described the shooter as "a black male, 19 to 25 years old, slim build, dark complexion, . . . black hair, and a low haircut." ECF No. 56-1 at 8. Further, the victim suggested that the shooter resembled an individual named "Marty," with whom Baby Jeff had met up before the shooting, though she did not directly identify the shooter as Marty. *Id.* (female victim identifying Marty as "a black male age 19 to 25 years old, medium complexion, and a low fro haircut"); ECF No. 76 at 2 (disputing whether the female victim reported that the shooter and Marty were "almost identical"). Vrtochnick did not "have Marty's identity at the hospital" and does not recall asking the victim anything else about Marty, such as if the victim had any photos of him, knew how to contact him, or would be willing to look at photos to identify him.

### 3.3 Vrtochnick's and Sarenac's Interaction with Barken at the Hospital

Vrtochnick and Sarenac talked with Barken at the hospital about the shooting, understanding that she had a stepmother/stepson-type relationship with Baby Jeff.

Barken provided her name, address, phone number, and employer to Vrtochnick and Sarenac. She then told the two detectives that she had an old phone at her home that she wanted to provide to police to see if they could retrieve a recording of a conversation on the phone, wherein a person threatened to kill Baby Jeff. She thought the recording might help police identify a suspect or develop a motive for the homicide. Barken provided to Vrtochnick and Sarenac the name or nickname of "Marty" for the person speaking in that recording; though Vrtochnick and Sarenac later could not recall the name Barken provided, Vrtochnick's handwritten notes from the hospital visit identify the person Barken referenced as "Marty." ECF No. 72 at 4; ECF No. 76 at 4 (Defendants characterizing Barken's summary of this fact as "misleading"); ECF No. 53-3 at 11 (Sarenac deposition transcript) ("I believe she gave us a name. . . . [T]here was at least a nickname or a proper name given."). Barken said that she had played the recording for MPD a couple weeks earlier, when another of its officers responded to a different incident, so she suggested that the threat may have been recorded on that officer's body-worn camera.

Barken said that she had the phone at her house and that she would retrieve it and bring it out to Sarenac and Vrtochnick. Sarenac and Vrtochnick requested that Barken drive with them, presumably in an MPD vehicle, to her home to retrieve the phone. But Barken said that she did not want to go with them to her home to pick up the phone. She told Sarenac

and Vrtochnick that they could go to her house to get the phone but that she did not want to leave in their vehicle with them, stating something to the effect of not wanting her family to see her being put in a squad car and leaving the hospital with them. Vrtochnick later testified that she was familiar with such concerns from her experience with MPD. Barken had her own vehicle at the hospital and stated that she was agreeable to the detectives following her to her residence to retrieve the cell phone.

Whether Jankowski ordered Barken's arrest while she was at the hospital is a point of contention between the parties. Barken acknowledges that Sarenac, Vrtochnick, and Jankowski's testimony conflicts on this matter. ECF No. 72 at 5. Vrtochnick testified that around 5:17 p.m., Jankowski directed that the detectives needed to call for a uniformed MPD squad car to meet them at the hospital to convey Barken. *Id.* (citing ECF No. 53-3 at 31). Sarenac provided the same testimony and also said that Jankowski ordered them to arrest Barken if she did not get into their squad car to ride to her home and get her cell phone. *Id.* (citing ECF No. 56-1 at 25). Jankowski, however, testified that he did not order Barken's arrest while she was at the hospital, that he knew that there was not enough evidence to get an arrest warrant for Barken while she was at the hospital, and that he simply got a brief synopsis from Sarenac and Vrtochnick about going to Barken's home to retrieve the phone, in response to which he told them "Sounds great, let me know what happens, go get her phone." *Id.* (citing ECF No. 53-2 at 21–23). Defendants contend that whatever dispute of fact exists as to whether Jankowski ordered Barken arrested is immaterial because Barken ultimately "left freely in her own vehicle," thereby demonstrating that she was not arrested. ECF No. 76 at 6 (citing ECF No. 56-1 at 25).

Whether the facts demonstrate that Barken was in fact under arrest at 5:17 p.m. at the hospital is also disputed.[3] ECF No. 72 at 5–6; ECF No. 76 at 6–7. It is undisputed that at 5:17 p.m., a squad car was ordered to the hospital to convey Barken. It is also undisputed that Barken, Sarenac, and Vrtochnick waited for almost an hour—until 6:10 p.m.—for the squad to show up. Barken waited in the detectives' MPD vehicle during that time. At 6:10, the detectives got sick of waiting and canceled the conveyance squad. The parties agree that it was not Barken's fault that the MPD squad car had not shown up after 53 minutes.

MPD paperwork that Sarenac completed later on the night of June 4, 2020 provides that Barken was arrested at 5:17 p.m. that day for "[r]esisting/obstructing" in violation of Wis. Stat. § 946.41(1). ECF No. 72 at 6 (citing ECF No. 53-2 and ECF No. 38-4 at 1); ECF No. 38-4.

Sarenac testified that between 5:17 p.m. and 6:10 p.m., Barken was not "free to leave if she had wanted to" but that he did not recall if he told her that she was under arrest. ECF No. 53-3 at 9. He also testified that he had probable cause to arrest Barken (presumably for obstruction, though he did not specify) at 5:17 p.m. at the hospital. *Id.* at 6. The factors that ostensibly informed this belief were that Barken voluntarily offered to give the detectives a phone that had some sort of recorded threats on it that police might find relevant to their homicide investigation, police wanted

_____

[3]Defendants at one point suggest that perhaps some lesser degree of detention, requiring a lower standard of proof, had occurred at the hospital. *See* ECF No. 76 at 6–7 ("[I]t is unclear if Barken was not arrested . . . , simply detained, or formally arrested at the hospital."). But Defendants do not directly argue in their submissions that the detectives needed only, or had, reasonable suspicion to detain Barken at the hospital. *See generally* ECF Nos. 69 (joint jury instructions), 78, 91.

that phone, and Barken's initial response was something to the effect of that she would get it to them later as she currently was at the hospital with 30–50 family members and friends and the phone was at her house. *Id.* at 6–7 (Sarenac characterizing Barken as "refusing" to get the cell phone). Sarenac acknowledged that he did not get a warrant for Barken's arrest or to seize the cell phone. *Id.* at 10–11.

Vrtochnick, on the other hand, testified that after the conveyance squad was ordered, Barken was free to leave but chose to stay with the detectives to wait for the squad. ECF No. 72 at 6 (citing ECF No. 56-1 at 25 (Vrtochnick testifying that "at 5:17 p.m." Barken was "not under arrest" and "would be free to leave")). Vrtochnick also acknowledged that she did not get a warrant for Barken's arrest or to seize the cell phone, and she testified that she did not discuss getting a warrant with anyone at MPD because she did not believe it was necessary or logistically feasible. *Id.* (citing ECF No. 56-1 at 27); ECF No. 56-1 at 27. She also testified that she believed that the detectives had enough information at that point to get a warrant to seize the phone, but no search warrant was sought or obtained. ECF No. 56-1 at 27.

Barken was never asked at her deposition whether she felt free to leave while she waited with Sarenac and Vrtochnick from 5:17 p.m. to 6:10 p.m. for the MPD squad to show up at the hospital. *See generally* ECF No. 78-3.

Sarenac and Vrtochnick eventually decided that the best way to get the phone from Barken would be to follow her to her house to retrieve it. Vrtochnick updated Jankowski to this effect. Ultimately, Barken drove her own vehicle to her home with Sarenac and Vrtochnick following. The detectives notified dispatch that they were leaving the hospital at 6:15 p.m.

and heading to Barken's home. While en route, Jankowski called the detectives and told them that Barken needed to come down to the police station to look at some photographs after she turned over the phone.

Barken states that she was cooperative through this interaction at the hospital. ECF No. 72 at 5, 7. Defendants dispute that Barken was cooperative at the hospital, pointing to testimony from Sarenac, Vrtochnick, and Jankowski stating that they viewed Barken as evasive or uncooperative, which slowed down their investigation of the homicide. ECF No. 76 at 5, 7 (citing ECF No. 56-1 at 52–54; ECF No. 53-2 at 10; and ECF No. 53-3 at 7).

### 3.4    Events at Barken's Home

When Sarenac and Vrtochnick got to Barken's home, Barken went inside her home, got the phone, and brought it out and gave it to them. Sarenac and Vrtochnick then asked her—as Jankowski had directed—to come down to the police station to continue helping solve the homicide by looking at some photos. Barken agreed to help police by looking at photos, but she said that she was unavailable to do so at that particular moment because she was with family and grieving, so she wanted to come to the police station at another time. Sarenac or Vrtochnick informed Jankowski of Barken's preference to view the photos later. But he determined that this was unacceptable, because he wanted her to look at the photographs right then, possibly to help get a dangerous homicide suspect off the street.[4] At

---

[4]Barken again states that she "remained cooperative" at this time and emphasizes that her request to view the photos later was reasonable, ECF No. 72 at 7–8 (citations omitted), both of which points Defendants dispute. ECF No. 76 at 8–9 (citations omitted).

Jankowski and Vrtochnick emphasized in their depositions that getting information about potential suspects in a timely manner is, generally, important

all times, Jankowski had no information about Barken from any source other than Sarenac and Vrtochnick.

The phone that Barken turned over to the detectives was not functional,[5] but Vrtochnick, Sarenac, and Jankowski all gave different testimony as to whether and how they each knew this before arresting, or ordering the arrest of, Barken outside her home (and, accordingly, whether it was a consideration in the probable cause determination). ECF No. 72 at 9; ECF No. 76 at 12–13. Sarenac testified that he knew that there was an "issue" with the cell phone which made it inaccessible but that he did not know what that issue was. ECF No. 53-3 at 62; *id.* at 15 ("I can't recall if the phone was broken, couldn't get into it."); *id.* at 32–33 ("Q: Can you recall if [the phone] was powered up, like charged, or if the battery was dead? A: I can't."). Sarenac further testified that he did not recall whether he told Jankowski any particular facts about the phone. *Id.* at 33. Vrtochnick

_____

to prevent retaliation, additional crimes, destruction of evidence, and/or witness intimidation. ECF No. 76 at 9–10; ECF No. 53-2 at 8–9; ECF No. 56-1 at 52. When asked why he was "unwilling to wait with the information [he] had at that moment," Jankowski testified that in his "21 years of experience . . . as a detective and a lieutenant, when people say they're going to show up at a later date, they don't." ECF No. 53-2 at 9.

[5]As will be discussed later, after Barken was arrested, she was taken into custody and interrogated by Gordon and Jordan. During that interview, Barken told Gordon and Jordan that the phone was "broken"; Gordon viewed or handled the phone during that interview and later testified that the phone did not appear smashed, broken, or cracked, but the zero button did not work. ECF No. 53-1 at 37.

Barken stated in her deposition that she did not recall the phone "not being in working condition" when she turned it over to the detectives at her home. ECF No. 78-3 at 27. She also stated that she "probably did let [Sarenac and Vrtochnick] know that the phone was broken, and they probably told me that they can still retrieve the things out of there," but she did not definitively recall having done so. *Id.* at 29.

testified that she did not recall "physically seeing" Barken's phone because Barken gave it directly to Sarenac. ECF No. 56-1 at 32. She also testified that she did not recall receiving any information at that time about whether the phone was "damaged or broken in some way." *Id.* at 16. Vrtochnick also testified that she did not tell Jankowski that the phone was broken, nor did she hear Sarenac do so. *Id.* at 16, 32, 38. Jankowski, on the other hand, testified that Sarenac called him and said that Barken had turned over an "old, broken" phone. ECF No. 53-2 at 24; *see also id.* at 9, 10, 15, 23 (similar testimony).

Around 6:40 or 6:45 p.m., Jankowski ordered Vrtochnick and Sarenac to arrest Barken and bring her down to the police station. The detectives believed that Jankowski wanted Barken to be booked for obstructing the homicide investigation, then interrogated in a Mirandized interview about the homicide, possibly on suspicion that she was involved in it. Sarenac argued with Jankowski that he and Vrtochnick should not be arresting Barken. ECF No. 72 at 9 (citing ECF No. 53-3 at 35 ("Q: . . . Do you agree that you questioned the order and argued with . . . Jankowski about how . . . you and Vrtochnick[] did not feel as though you should be arresting Barken because she was cooperative? A: Yes."); ECF No. 53-2 at 24 (Jankowski testifying similarly); and ECF No. 56-1 at 32 (Vrtochnick testifying similarly)).

Jankowski did not explain to Sarenac or Vrtochnick his reasoning for ordering Barken's arrest. *See* ECF No. 76 at 12; ECF No. 53-3 at 62–63; ECF No. 56-1 at 33. Nonetheless, as he later testified, Jankowski believed that there was probable cause to arrest Barken:

Q: . . . What was your rationale or your probable cause for that particular arrest [outside Barken's home] with the information you had?

A: The main basis was that the cell phone that . . . Barken provided; again, that the word clearly broken and old was used, but in addition to that . . . [i]t was the totality of their interview that they conveyed to me by telephone, and that she was being evasive and not being forthwith with the information she had. . . . It was clear to them that she was withholding information . . . .

ECF No. 53-2 at 10; ECF No. 76 at 10. Jankowski repeated his order to arrest to Sarenac and Vrtochnick three or four times.

Though he disagreed with Jankowski's order to arrest Barken, Sarenac testified that he believed that facts supporting probable cause existed to arrest Barken at her home for obstruction. ECF No. 76 at 10. Specifically, he testified that Barken "delay[ed] [the detectives] from getting the cell phone right here right now." ECF No. 53-3 at 7; *see also id.* at 10. He also cited as relevant that the cell phone was possibly broken or that "there was a delay in getting into the phone . . . ." *Id.* at 15. Based on these facts, he stated, Barken was arrested "for obstructing," and for "not giving us the phone, [which was] evidence in a homicide which she had and was keeping from us." *Id.* at 9. He testified that he did not view Barken's declining to look at suspect photos at that moment as obstruction. *Id.* at 45–46.

Sarenac concedes that he had no information that Barken lied to police, knowingly gave false information, knowingly placed physical evidence with the intend to mislead, or provided untruthful information.[6]

---

[6]Moreover, "Defendants concede they had no articulable information as to Barken's intent in her delay of the investigation." ECF No. 76 at 14. They state that "[t]here is no support for such a conclusion in the record; however, absence of support is not equivalent to absence of intent." *Id.*

Sarenac relied on Jankowski's order and determination that probable cause existed to arrest Barken.

Vrtochnick also relied on Jankowski's order and determination that probable cause existed to arrest Barken. ECF No. 56-1 at 33 ("Q: [O]n June 4th, 2020, you would not have arrested . . . Barken but for the order from . . . Jankowski? A: Yes."); *id.* at 48. She stated that "[g]iven what information [she] had at the time," she did not then believe that Barken was "suspicious." *Id.* at 57; *but see id.* at 53 ("Sarenac and I arrested [Barken] on the basis that . . . Jankowski said that there was probable cause to arrest her. . . . I would say that there was probable cause to arrest [Barken], but . . . I maintain my position that I would probably have tried to have done things a little bit differently."). Vrtochnick also testified that Barken's behavior of declining to come to the police station right away was, in her law enforcement experience, not "normal." *Id.* at 51.

Similar to Sarenac, Vrtochnick testified that she had no information at that time that Barken lied to her and that she did not report any such information to Jankowski. *Id.* at 37. She further testified that she did not tell Jankowski that Barken had given the detectives a fake or misleading phone and that she did not say or do anything that would have portrayed to Jankowski that Barken gave her or Sarenac false information regarding the identity of a murder suspect. *Id.* at 38.

Vrtochnick relayed Jankowski's arrest order to Barken, explaining that Barken would be arrested if she did not voluntarily come down to the police administration building at that time. It was obvious to Sarenac that Barken did not believe that the detectives had any right to arrest her.

Barken was then arrested, handcuffed, and transported in the back of a squad car to MPD facilities.

Case 2:22-cv-00783-JPS    Filed 09/30/24    Page 15 of 40    Document 92

### 3.5 Barken's In-Custody Interview

Barken was ultimately taken to the MPD police administration building and booked. At 9:30 p.m., Barken spoke to Detectives Gordon and Jordan in a Mirandized, in-custody interview at the police administration building. The interview lasted about three hours. During the interview, Barken told Gordon and Jordan that the phone was "broken." Gordon testified that he "[v]aguely" recalled that the zero button on the phone screen was not working, and he agreed that, from his review of video of Barken's interview, the phone screen did not appear smashed, cracked, or otherwise broken. ECF No. 53-1 at 37. Jordan also recalled that the zero button was, for no clear reason, not working. ECF No. 53-4 at 14.

Barken was released around 2:00 a.m. There was never any judicial review of her arrest, and no charges against her in connection to this incident were ever referred to the Milwaukee District Attorney.

## 4. ANALYSIS

Barken raises the following claims: (1) Defendants arrested Barken without probable cause in violation of the Fourth Amendment; (2) Defendants excessively detained Barken without probable cause after she was arrested, in violation of the Fourth Amendment; and (3) Defendants failed to intervene in one another's alleged constitutional violations. ECF No. 14 at 19.

She now seeks summary judgment as to Defendants' liability on the issues of unreasonable arrest and unreasonable detention. In effect, she seeks a finding that she was arrested without probable cause and instead for an illegitimate purpose. Specifically, she requests that the Court determine as a matter of law that "[h]er arrest for the purpose of having her look at photo line-ups and otherwise give information to help police solve

a homicide that they did not suspect her of committing (or even witnessing) was unreasonable under the Fourth and Fourteenth Amendments . . . ." and that "[h]er entire post-arrest detention, for the purpose of interrogating her about someone else's crime[,] was unreasonable . . . regardless of whether there was probable cause to support an arrest . . . ." ECF No. 73 at 4.

Defendants seek findings on summary judgment that they had probable cause or arguable probable cause to arrest Barken for obstruction of the homicide investigation, that her detention after her arrest was not unreasonable, and that they are entitled to qualified immunity. ECF No. 78 at 8–10, 13–15.

### 4.1    Lawfulness of Barken's Arrest

#### 4.1.1   Legal Standard

The Court must first and foremost decide whether Barken was lawfully arrested for obstruction[7] on June 4, 2020. "To prevail on a Fourth

---

[7]Although "an arrest can be supported by probable cause that the arrestee committed any crime, regardless of the officer's belief as to which crime was at issue," *Abbott v. Sangamon County*, 705 F.3d 706, 715 (7th Cir. 2013) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) and *Fox v. Hayes*, 60 F.3d 819, 837 (7th Cir. 2010))  the parties only ever argue in their briefing about whether a sufficient legal basis existed to arrest Barken specifically for obstruction. The Court will therefore limit its analysis to this offense.

Defendants attempt to introduce a dispute of fact as to whether Barken was a suspect in Baby Jeff's homicide. *See supra* Section 3.1 (noting that Jankowski testified that it was "possible" that Barken was a suspect in the homicide "as party to a crime and facilitating"); *see also supra* Section 3.4 (noting that Sarenac and Vrtochnick believed Jankowski wanted Barken to be interviewed about the homicide "possibly on suspicion that she was involved in it"). But when deposed, Jankowski could not articulate any specific facts that would have supported probable cause to arrest Barken for such an offense and in fact conceded that "probable cause to arrest for the crime of homicide did not exist . . . ." ECF No. 53-2 at 25. Even if Defendants now say that Barken was a suspect in the homicide, they still had to have probable cause to arrest her for a homicide offense. There is

---

Amendment false-arrest claim, 'a plaintiff must show that there was no probable cause for h[er] arrest.'" *Braun v. Village of Palatine*, 56 F.4th 542, 548 (7th Cir. 2022), *reh'g denied,* No. 20-3227, 2023 WL 2188741 (7th Cir. Feb. 23, 2023) (quoting *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016)). "The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest . . . ." *Abbott*, 705 F.3d at 713–714 (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)); *see also Norris v. Serrato*, 761 F. App'x 612, 615 (7th Cir. 2019) (noting the same as to claims of unlawful pretrial detention (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015))).

Probable cause to arrest exists "when the facts and circumstances that are known to [the officer] reasonably support a belief that the individual has committed, is committing, or is about to commit a crime." *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007) (citing *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007) *and United States v. Parra*, 402 F.3d 752, 763–64 (7th Cir. 2005)). This is a "common-sense inquiry requiring only a probability of criminal activity." *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)); *see also Abbott*, 705 F.3d at 714 ("[P]robable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity . . . ." (citing *Henry v. United States*, 361 U.S. 98, 102 (1959) and *Fox*, 600 F.3d at 833)). "The probable cause standard requires that the officer's belief be reasonable, not that it be correct." *Huff v. Reichert*,

---

no support in the record nor any good-faith argument that they had such probable cause.

Page 18 of 40

Case 2:22-cv-00783-JPS    Filed 09/30/24    Page 18 of 40    Document 92

744 F.3d 999, 1007 (7th Cir. 2014) (citing *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)).

"In an unlawful arrest case in which the defendants raise qualified immunity as a defense," even if the Court determines that there was no probable cause for arrest, it must still determine "whether a reasonable officer could have mistakenly believed that probable cause existed." *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). This is known as "arguable probable cause." *Id.* (quoting *Humphrey*, 148 F.3d at 725). "In other words, a law enforcement official who 'reasonably but mistakenly conclude[s] that probable cause is present' is entitled to immunity." *Gottlieb v. Sgt. Richards*, No. 01 C 3522, 2002 WL 31109380, at *2 (N.D. Ill. Sept. 23, 2002) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

"The existence of probable cause or arguable probable cause depends, in the first instance, on the elements of the predicate criminal offense[] as defined by state law." *Abbott*, 705 F.3d at 715 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) and *Thayer v. Chiczewski*, 705 F.3d 237, 246–47 (7th Cir. 2012)). Importantly, however, probable cause does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Hawkins v. Mitchell*, 756 F.3d 983, 994–95 (7th Cir. 2014) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972) and citing *Spiegel v. Cortese*, 196 F.3d 717, 724 n.1 (7th Cir. 1999)). Additionally, "officers need not 'establish probable cause as to *each and every* element of a

crime before they are entitled to make an arrest." *Id.* (quoting *Spiegel*, 196 F.3d at 724 n.1).[8]

As to the predicate criminal offense: Wisconsin law makes it a misdemeanor to "knowingly resist[] or obstruct[] an officer while such officer is doing any act in an official capacity and with lawful authority." Wis. Stat. § 946.41(1). "'Obstructs' includes without limitation knowingly giving false information to the officer or knowingly placing physical evidence with intent to mislead the officer in the performance of his or her duty . . . ." Wis. Stat. § 946.41(2)(a). The parties agree that Defendants were acting in their official capacities.

The Wisconsin Pattern Jury Instructions include two relevant[9] instructions that define when a person "obstructs" within the meaning of this statute. Wis. Crim. Jury Instruction 1766, *available at* https://wilawlibrary.gov/jury/files/criminal/1766.pdf (last visited Sept. 30, 2024) (titled "Obstructing an Officer—§ 946.41(1)") (hereinafter "Instruction 1766"); Wis. Crim. Jury Instruction 1766A, *available at*

---

[8] *But see Evans v. Gasca*, No. 14-CV-10518, 2016 WL 1407695, at *5 & n.8 (N.D. Ill. Apr. 11, 2016) (explaining that "*Spiegel* makes seemingly inconsistent statements about whether probable cause has to be established 'for each and every element' of an offense before an officer is authorized to make a warrantless arrest" or whether only "reasonably trustworthy information . . . that the arrestee . . . had committed a crime" is sufficient (citing and quoting *Gottlieb,* 2002 WL 31109380, at *3 n. 1)).

[9] The Court rejected Barken's attempt to preclude Defendants from arguing that a physical resistance instruction was necessary based on the facts of this case. ECF No. 68 at 6–10. The parties do not now include a physical resistance instruction in their joint proposed jury instructions, ECF No. 69, showing that Defendants are not arguing a theory that Barken was arrested for physically resisting in violation of Wis. Stat. § 946.41(1). Rather, "Defendants' theory of the case is that they had probable cause to arrest [Barken] for . . . nonphysically interfering" with the homicide investigation. ECF No. 68 at 8.

https://wilawlibrary.gov/jury/files/criminal/1766A.pdf (last visited Sept. 30, 2024) (titled "Obstructing an Officer: Giving False Information— § 946.41(2)(a)") (hereinafter "Instruction 1766A"). The parties include both instructions in their joint proposed jury instructions, ECF No. 69 at 3–6, so the Court will enumerate the elements of each distinct theory of an obstruction charge. *See State v. Caldwell*, 454 N.W.2d 13, 16 (Wis. Ct. App. 1990) (noting that the two offenses entail "alternative modes of proof" (citing *State v. Crowley*, 422 N.W.2d 847, 849 (Wis. 1988))).

Obstructing an officer occurs when a person "knowingly obstructs an officer while the officer is doing any act . . . with lawful authority." ECF No. 69 at 3 (reproducing Instruction 1766). The relevant elements of an obstruction charge are:

(1) the person obstructed an officer. . . . [which] means that the conduct of the person prevents or makes more difficult the performance of the officer's duties[;] [t]he refusal to answer an officer's questions, by itself, is not obstructing an officer;

(2) the officer was acting with lawful authority[;] . . . [and]

(3) the person knew that the officer was acting with lawful authority and that the person's conduct would obstruct an officer.

*Id.* at 3–4 (reproducing Instruction 1766).

Meanwhile, obstructing an officer by giving false information occurs when a person "knowingly gives false information to an officer with the intent to mislead the officer in the performance of his or her duty while the officer is doing any act . . . with lawful authority." *Id.* at 5 (reproducing Instruction 1766A). The relevant elements of a charge of obstruction by giving false information charge are:

Case 2:22-cv-00783-JPS    Filed 09/30/24    Page 21 of 40    Document 92

(1) the person knowingly gave false information to an officer[;] . . . [r]efusal to give information may not be equated with giving false information;

(2) [t]he officer was acting with lawful authority[; and]

(3) [t]he person intended to mislead the officer[, which] requires that the person knew that the officer was acting with lawful authority and that the person had the purpose to mislead the officer in the performance of his or her duties[, but i]t is not required that the officer was misled.

*Id.* (reproducing Instruction 1766A).

The offenses are distinct in that a straight charge of obstruction requires that the person have *actually* obstructed the officer, whereas a charge of obstruction by giving false information does not require actual obstruction to have occurred. *See* ECF No. 68 at 14–22 (examining this issue).

The third element of "knowledge" for either offense must be found from the person's acts, words, and statements, and from all the facts and circumstances in the case. ECF No. 69 at 4–6; *see also State v. Lossman*, 348 N.W.2d 159, 167 (Wis. 1984) (noting that the knowledge element is "subjective" and "must be ascertained[] based on the totality of the circumstances, including what the defendant said or did, what the officer said or did, and any objective evidence which is available").

"Resisting an unlawful arrest is not a crime and therefore cannot provide probable cause for arrest" for obstruction. ECF No. 69 at 3. Likewise, "[a] refusal to cooperate, without more, does not furnish the minimum level of objective justification needed" for a seizure. *Id.* at 4. And "not every barrier placed in the path of an officer gives rise to a violation of [S]ec. 946.41(1)." *State v. Hamilton*, 356 N.W.2d 169, 171 (Wis. 1984); *see also Henes v. Morrissey*, 533 N.W.2d 802, 808 (Wis. 1995) ("The action justifying

Case 2:22-cv-00783-JPS    Filed 09/30/24    Page 22 of 40    Document 92

an arrest for obstruction cannot simply 'inconvenience' the official . . . ." (quoting *Hamilton*, 356 N.W.2d at 171)).

### 4.1.2   Summary of Parties' Arguments and Initial Issues

Barken argues that she was not arrested for obstruction but rather was "subjected to an illegal investigatory arrest" for the sole purpose of "persuading [her] to answer questions about someone else's crime." ECF No. 73 at 10. She contends that, to show probable cause for arresting her for obstructing the homicide investigation, Defendants have pointed only to "vague allegation[s] of Barken causing 'delay' or 'frustration' by not immediately consenting to [Defendants'] requests" to turn over the phone that she said contained information relevant to the homicide investigation, to go with Sarenac and Vrtochnick in an MPD vehicle to her home to retrieve the phone, and to review a photo lineup. *Id.* at 12–13. This, she says, is not enough, *id.* at 13, and neither is Jankowski's assertion, to the extent the Court accepts it as true, that Barken turned over a broken phone, *id.* at 17–19. She also argues that Sarenac and Vrtochnick were not entitled to rely on Jankowski's determination that probable cause existed. *Id.* at 19–20.[10] Additionally, Barken argues that her actions could not have actually obstructed the homicide investigation because another witness—the surviving female victim with whom Sarenac and Vrtochnick interacted at the hospital—could have identified the suspect and/or because "the recording Barken was informing them about had been played for one of

---

[10]Because the Court concludes *infra* that neither of the on-scene detectives nor Jankowski had probable cause to suspect Barken of obstruction, it need not address Barken's arguments about whether Sarenac and Vrtochnick were entitled to rely on Jankowski's order to arrest. It accordingly addresses that argument no further.

their co-workers, and therefore might still be on his body camera." *Id.* at 20; ECF No. 82 at 11.

Barken further argues that it was not illegal for her to decline Sarenac, Vrtochnick, and Jankowski's requests that she participate in their investigation because it is not illegal *per se* to ignore or decline to cooperate with police, and that to the extent the officers were making *orders*, Barken's failure to comply with those orders was not obstruction because they had no lawful authority to detain her or order her to do anything in the first place. ECF No. 73 at 13–16.

Defendants, on the other hand, argue that Jankowski reasonably, or reasonably but mistakenly, believed that he had probable cause that Barken was obstructing the homicide investigation because she "delayed providing the crucial and critical piece of evidence [that] she asserted contained the identity and motive of the suspect," provided a phone that "appeared to be significantly different from her representations at the hospital," attempted to "re-schedule viewing a photo array," and engaged in "continued delays, evasive conduct, and negotiations [that] caused the officers' investigation to come to an almost complete stop." ECF No. 78 at 16. They further argue that while Barken did not refuse to cooperate in the investigation (and indeed concede that it is generally her right to do so), she nevertheless agreed to cooperate and *then* "delay[ed]" and "misdirect[ed]" the investigation. *Id.* at 17; *see also id.* at 9 ("[T]he law [does not] allow[] Barken to offer items of evidentiary value, and then drag her feet making their jobs more difficult by delaying the item's tender . . . ."). They contend that "[n]one of this [behavior] made sense" and that it was inconsistent with Barken's representations that "she was mourning someone so emotionally significant to her" and wanted to help solve his murder. *Id.* at 13, 16–17.

Based upon all this, Defendants argue that Jankowski, and accordingly Sarenac and Vrtochnick, had a proper legal basis to arrest Barken for obstruction.

As a general matter, the Court will disregard Sarenac, Vrtochnick, and Jankowski's testimony that probable cause existed to the extent that it attempts to displace *the Court's* ultimate resolution of this legal conclusion. The Court therefore focuses its analysis primarily on the facts that were available to Sarenac, Vrtochnick, and Jankowski leading up to Barken's arrest on June 4, 2020. To be sure, these officers can speak to whatever mental impressions they had and assessments they made on that date, but their legal conclusions, reached either at the time of the relevant events or post hoc in depositions, are owed no weight at summary judgment.

Another threshold issue is when Barken was placed under arrest— did it occur at 5:17 p.m. at the hospital or around 6:45 p.m. in front of her home? Put another way: at what point(s) in time were Sarenac, Vrtochnick, and Jankowski required to have probable cause that Barken had committed, was committing, or was about to commit a crime?

The record is disputed as to whether Barken was under arrest at the hospital and whether Jankowski ordered her arrest at that time. *See supra* Section 3.3. Defendants acknowledge that Sarenac's paperwork reports that Barken was arrested at 5:17 p.m. for "[r]esisting/obstructing" and that an MPD arrest conveyance was ordered to the hospital at that time. *See* ECF No. 76 at 6. But they seem to assert that, at and around 5:17 p.m. at the hospital, the on-scene detectives and Jankowski needed only reasonable suspicion to detain Barken (or order her detained) for questioning, or that Barken consented to questioning and remained with the detectives voluntarily. *Supra* note 3. They further assert that, because she eventually

left the hospital in her own vehicle (followed by the detectives), there is little support for a conclusion that she was actually under arrest at that time. *Id.* at 6. Confusingly, they also stress that Sarenac testified as to the facts that he believed supported probable cause to arrest Barken at that time. *Id.*

Defendants' equivocation on this issue aside, it is not in dispute that Sarenac, Vrtochnick, and Jankowski were required to have probable cause to arrest, or order the arrest of, Barken later that evening in front of her home. *See, e.g.*, ECF No. 78 at 8 (referencing "the probable cause that accumulated over the hours Defendants interacted with Barken at the hospital and later at her home"). Accordingly, any dispute of fact as to whether Barken was ordered arrested or placed under arrest at 5:17 p.m. at the hospital is ultimately immaterial because the parties agree that she was, eventually, arrested and that probable cause was required for that arrest. The Court therefore focuses its analysis on determining whether all the facts that Sarenac, Vrtochnick, and Jankowski knew prior to Barken's arrest at about 6:45 p.m. amounted to probable cause. What Sarenac and Vrtochnick observed at the hospital and what Jankowski knew of those observations is, of course, still relevant to this analysis.

### 4.1.3 Probable Cause

Even viewing all the facts, resolving all factual disputes, and drawing all reasonable inferences in Defendants' favor (as the Court must for purposes of considering Barken's motion, *Nucap*, 273 F. Supp. 3d at 997), the Court concludes as a matter of law that probable cause did not exist at any time to arrest Barken for obstruction. The Court first applies this analytical lens to clarify what specific facts were available to Sarenac, Vrtochnick, and Jankowski leading up to Barken's arrest, and what inferences those facts reasonably permit.

Case 2:22-cv-00783-JPS    Filed 09/30/24    Page 26 of 40    Document 92

At the hospital, Sarenac and Vrtochnick learned that Barken had at her home a phone that contained a recording of a threat on Baby Jeff's life. Vrtochnick noted that Barken said that the person speaking on the recording was an individual named Marty. The female surviving victim of the shooting described the person who shot her and who killed Baby Jeff as resembling an individual named Marty, who Baby Jeff knew. So, not only did Sarenac and Vrtochnick know that Barken had an item of possible evidentiary value that might have identified a suspect and a motive for the homicide, but they also knew that the female victim—an eyewitness to the shooting—also had information of possible evidentiary value and also might have been able to identify a suspect. Jankowski knew the former; it is not clear if he knew the latter. Even assuming for the sake of argument that Barken and the female victim were not talking about the same person, the detectives had at least one other source of information about the homicide suspect(s) besides the recording on the phone. Plus, Barken had apparently played the recording for an MPD officer on a previous occasion, so some version of the information therein was ostensibly already available to the detectives.

While it is obvious that Sarenac and Vrtochnick wanted the recording on Barken's phone for their investigation, and reasonable to assume that they wanted to access it quickly in order to potentially apprehend a suspect, the record demonstrates that the recording was not the only source of information they had about the crime nor was the phone the only source of the information in the recording. It is therefore not reasonable to infer that the investigation could not proceed if the detectives did not get Barken's phone right away or that not having it brought the homicide investigation "to a standstill" as Defendants characterize it. ECF

No. 78 at 12. And it is not reasonable to infer that the detectives needed the phone itself to investigate Barken's specific "assertion as to the identity and motive of a murderer," *id.*, not only because Barken had already played the recording at an earlier time and Defendants have offered no evidence that the recording or some version of the information in it was not already available to MPD, but also because Barken identified the speaker in the recording as "Marty" to the detectives at the hospital.

The record in this case also does not reasonably support an inference that, while at the hospital, Barken was intentionally delaying turning over the phone to MPD. First, Sarenac and Vrtochnick knew that the phone was at Barken's home and therefore not immediately physically available to be turned over. Therefore, in any event there would have been *some* delay in MPD receiving the phone to use in the investigation, even if Barken had acquiesced right away to Sarenac and Vrtochnick's request to ride with them in an MPD vehicle to her home to pick it up. Any such delay was obviously not Barken's fault. Second and more importantly, the nearly one-hour delay in getting to Barken's house to retrieve the phone ultimately, and undisputedly, arose because the MPD conveyance squad car that was ordered to the hospital did not show up before Sarenac and Vrtochnick got tired of waiting for it, and this delay was not attributable to anything that Barken did.[11] The detectives' and Jankowski's testimony that Barken was

---

[11]Whether Jankowski ordered Sarenac and Vrtochnick to request the conveyance squad, and relatedly whether Barken was under arrest at that point such that a conveyance squad was deemed necessary, is in dispute but is immaterial. Someone (it does not matter who) within MPD insisted that Barken be transported to her home in an MPD conveyance squad, and that was the reason for the delay from 5:17 p.m. until 6:10 p.m. in Barken and the detectives getting to her home.

responsible for delaying the investigation from the time she began talking to the detectives until she left the hospital with them is not borne out by the facts.

The record might support an inference that, by initially declining to ride in an MPD vehicle to go get the phone, Barken was being "evasive" or "uncooperative" in a manner demonstrating an intent to impede the investigation. Viewed in the light most favorable to Defendants, this action—despite her alternative offer to drive her own vehicle to get the phone, with the detectives following—could be consistent with an intent to slow down the investigation: if she was sincerely volunteering to assist in the investigation, why not go along with the detectives' request?[12]

In any event, the record demonstrates that Barken ultimately *did* submit to the plan to ride to her home in an MPD conveyance squad, for as long as Sarenac and Vrtochnick pursued that plan. Barken waited (or was made to wait) in the detectives' vehicle while waiting for the conveyance squad to arrive. Defendants offer no evidence that she was disorderly or defiant in a way that impeded the investigation during this time. There can be no inference that Barken's behavior while waiting in the detectives' car impeded the investigation.

---

[12] Defendants also say that "[n]one of this [behavior] made sense," ECF No. 78 at 13, effectively admitting that Barken's behavior might have been confusing, but not suspicious, to the detectives. Viewing Barken's behavior in a light favorable to her, her attempting to negotiate an alternative means and time of getting the phone to MPD was either simply confusing to the detectives or consistent with an intent to cooperate—just in a way that was perhaps better or safer for her, because as Vrtochnick acknowledged, people assisting police often don't want to be known as doing so. ECF No. 76 at 5. Barken also provided a plausible explanation for not wanting to immediately go along with the detectives' request: she wanted to remain with her family and friends to grieve Baby Jeff.

On arrival at her home, Barken turned over the phone to the detectives. The record demonstrates that as soon as Barken was in a position to physically hand over the phone, she did so. There is no support for any inference that Barken somehow further "delayed" the investigation by not physically handing over the phone once she got home.

Once the detectives had the phone in hand, their other possible factual bases for probable cause to arrest Barken for obstruction were (1) Barken having handed over a supposedly broken or non-functional phone, and (2) her declining to go to the police station immediately to look at a photo array.

Taking the facts and testimony, and inferences therefrom, in Defendants' favor, the Court can assume that Sarenac knew or reasonably believed that the phone was broken or non-functional (he testified that he could not recall what the issue was but that he "couldn't get into" the phone) and that he told Jankowski as much (he could not recall whether he told Jankowski anything about the phone, but Jankowski said that Sarenac did so). The Court can further assume that Jankowski testified truthfully that Sarenac informed him that the phone was "old" or "broken." Finally, the Court can assume that Barken herself knew at that time that the phone was inaccessible because of how she later described the phone and how it appeared in her interview with Gordon and Jordan.

Even assuming that Barken knew that the phone was non-functional, though, Defendants concede that they had no articulable facts as to Barken's intent to delay the investigation; Sarenac and Vrtochnick also testified that they had no information that Barken lied to them or gave them physical evidence with intent to mislead. Further, there is no evidence in the record that Barken made any representation to Sarenac or Vrtochnick

about the condition of the phone before the detectives arrived at her house and saw it for themselves. So the Court cannot reasonably grant inferences that Barken affirmatively misrepresented the condition of the phone, or that Sarenac, Vrtochnick, or Jankowski had a basis to believe that she did. The Court also cannot reasonably grant an inference that Sarenac, Vrtochnick, or Jankowski reasonably believed that Barken intended to obstruct or mislead the investigation by handing over a phone that she knew was not functional, because they have conceded that they had no articulable facts that would have supported such a belief.

When Barken declined to go to the police station immediately to view suspect photos, Vrtochnick viewed it as "not normal" and Jankowski was concerned that Barken would not follow through. *Supra* note 4. (Sarenac said that he did not view this as obstruction.) But again, Defendants have conceded that they had no articulable facts as to Barken's intent in delaying the investigation, and the Court sees nothing in the record that would run counter to this concession. Accordingly, it cannot grant an inference that Barken intended to impede the investigation by delaying viewing suspect photos.

This version of the facts—again, recounted in the light most favorable to Defendants—fails to demonstrate that the information that Sarenac, Vrtochnick, and Jankowski knew amounted to probable cause to arrest Barken for obstruction. As explained above, Seventh Circuit precedent makes clear that while the elements of the relevant crime guide the probable cause analysis, the Court need not treat them as a checklist. *Abbott*, 705 F.3d at 715 (citations omitted); *Hawkins*, 756 F.3d at 994–95 (citations omitted). But the record in this case indicates that Sarenac, Vrtochnick, and Jankowski lacked probable cause as to multiple elements

Case 2:22-cv-00783-JPS    Filed 09/30/24    Page 31 of 40    Document 92

of an obstruction or obstruction by giving false information offense under Wisconsin law. The Court therefore cannot conclude that they reasonably believed that there was "a probability of criminal activity." *Leaver*, 844 F.3d at 669 (quoting *Whitlock*, 596 F.3d at 411).

As to an obstruction offense, the record fails to show that Sarenac, Vrtochnick, or Jankowski reasonably believed that Barken's conduct would actually obstruct the homicide investigation or that she knew her conduct would obstruct. *See* ECF No. 69 at 3–4 (reproducing Instruction 1766). Defendants argue that Barken "delayed providing the crucial and critical piece of evidence" in the investigation, ECF No. 78 at 16, but as discussed above, the detectives and Jankowski had access to other evidence to pursue leads.

The officers' testimony that Barken's conduct, as opposed to other forces, delayed their investigation does not make that conclusion true. The record as a whole does not demonstrate that Barken was the main cause of delay. *State v. Hamilton*, 356 N.W.2d at 174 ("[N]or does the officer's testimony lend itself to a reasonable inference that the defendant's refusal to furnish the information affected the investigation in any way.").

The officers might have reasonably believed that Barken was impeding the investigation when she initially declined to ride in an MPD vehicle to her home to pick up the phone. But the facts that she (1) suggested an alternative way to get the phone and (2) eventually submitted to going in an MPD vehicle to get the phone cut against a conclusion that she meant to, or did, impede the investigation. With respect to the other alleged delay, and as explained above, there is no basis in the record on which a reasonable juror could conclude that Sarenac, Vrtochnick, and Jankowski had reason to believe that Barken knew that she would obstruct or intended

to obstruct their investigation by delaying viewing suspect photos. Did her actions make the investigation "more difficult" as described in Instruction 1766? Maybe, but "not every barrier placed in the path of an officer gives rise to a violation of [Wis. Stat. §] 946.41(1)." *Id.* at 171. Any barrier that Barken supposedly placed in Sarenac, Vrtochnick, and/or Jankowski's performance of the investigation does not satisfy the applicable obstruction standard.

As to an obstruction by giving false information offense, there is no basis in the record to conclude that Sarenac, Vrtochnick, or Jankowski had reason to believe that Barken affirmatively gave false information about the phone, or any other topic. Nor does the record show that the officers had reason to believe that she knew she would mislead or intended to mislead their investigation by handing over a phone that she knew was not functional. For this reason, *McComas v. Brickley*, on which Defendants rely, is inapposite. ECF No. 78 at 15–16 (citing 673 F.3d 722 (7th Cir. 2012)). In that case, the defendant detective investigating a homicide had a reason to believe that the plaintiff was lying during that investigation: the detective reviewed video surveillance footage before interviewing the plaintiff, and when interviewed, the plaintiff denied multiple facts documented on the surveillance video. *McComas*, 673 F.3d at 724–25. On this basis, the Seventh Circuit upheld that arguable probable cause existed to arrest the plaintiff for false informing. *Id.* at 727. In this case, there is no evidence that Barken made any verifiably false statements or that Sarenac, Vrtochnick, or Jankowski knew or believed that she did.

Defendants contend that the three officers had probable cause because Barken's conduct did not make sense and was, from their perspective, inconsistent with what would be expected from someone who

had recently lost a loved one to a crime of violence and who wanted to help solve the crime. ECF No. 78 at 16–17. Giving an "incredible" story that "sound[s] like it was fabricated to protect" the crime suspect might support probable cause for obstruction. *Farr v. Paikowski*, No. 11-C-789, 2013 WL 160268, at *3, 6 (E.D. Wis. Jan. 14, 2013). "Implausible or unbelievable scenarios can support a finding of probable cause." *Id.* at *6 (citing *United States v. Brown*, 366 F.3d 456, 461 (7th Cir. 2004)). But behavior that is confusing to officers is not the same as behavior calculated to obstruct or mislead.

In *Farr*, the plaintiff told the officer who initially responded to the underlying crime that she had no previous relationship with the suspect, yet that she had picked him up and drove him in her car, eventually to a tire shop where the suspect threatened to burn down the building. *Id.* at *1. The detective who followed up on the incident "found it incredible that Farr picked up a complete stranger and gave him a ride in her car" and also "did not understand why Farr would not let [the responding officer] speak to her son about the incident." *Id.* at *3. The district court concluded that these facts gave rise to probable cause to arrest the plaintiff for obstruction. *Id.* at *6 ("Both men reasonably thought that Farr was lying because her explanation about how she picked up a complete stranger to help her find a shop to fix her flat tire seemed convoluted and absurd."). Barken's case is distinguishable from *Farr*. Barken explained to Sarenac and Vrtochnick her reasons for not wanting to immediately comply with their requests: she did not want to be seen riding in an MPD vehicle (which Vrtochnick validated as a common concern), and she wanted to be with family and friends. The Court cannot conclude that these explanations were implausible, convoluted, or absurd, nor that they would have led the officers to

reasonably believe that Barken was lying or trying to slow down the investigation.

The record also fails to show that the three officers had reason to believe that Barken knew that they were acting with lawful authority. Indeed, Sarenac admitted that he knew that Barken did not believe that the detectives had any right to arrest her. Moreover, probable cause for obstruction requires the arresting officers to have been acting with lawful authority in the first instance, and Defendants have failed to illustrate this element. Defendants have not and cannot make a good-faith argument that Barken was suspected of any crime besides obstruction. *See supra* note 7. So they must establish that Sarenac, Vrtochnick, and Jankowski had "lawful authority to make the demand [that Barken hand over the phone, ride in an MPD vehicle to retrieve it, or view suspect photos] in the first place" to show that there was "probable cause to believe plaintiff was violating § 946.41(1) by ignoring [their] directive[s]." *Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 878 (E.D. Wis. 2015) (quoting *Brunner v. McKillip*, 488 F. Supp. 2d 775, 784–85 (W.D. Wis. 2007)).

Defendants have not pointed to any authority that would allow the officers to make these demands in the absence of a warrant, reasonable suspicion that Barken was committing a crime (that is, a crime *other* than obstruction) such as would justify detaining her for investigative purposes, or probable cause to arrest her (again, for a crime other than obstruction). *Pullen v. House*, 88 F. Supp. 3d 927, 939 (W.D. Wis. 2015) ("If defendants did not have lawful authority to detain plaintiff under the Fourth Amendment, then it follows that they did not have lawful authority to give him orders either." (citing *Brunner*, 488 F. Supp. 2d at 784)); *see also supra* note 3 (explaining that Defendants have not argued that the detectives needed

Case 2:22-cv-00783-JPS    Filed 09/30/24    Page 35 of 40    Document 92

only, or had, reasonable suspicion to detain Barken). Their arguments also invite the Court to conclude that once Barken had offered an item of evidentiary value to Sarenac and Vrtochnick, she was required to turn over the item in the exact manner that they and Jankowski directed, and that once she had committed to turning over the phone, she was required to continue assisting in the investigation by promptly looking at suspect photos, and that doing otherwise was obstruction. But they cite no authority for this proposition, and it runs counter to the Fourth Amendment. *Id.* at 939–40 ("[A] person not seized under [the] Fourth Amendment 'doesn't have to answer the officer's questions—he can turn on his heels and walk away[.]'" (quoting *United States v. Brewer*, 561 F.3d 676, 678 (7th Cir. 2009))).

For all these reasons, the facts that Sarenac, Vrtochnick, and Jankowski knew, when viewed comprehensively and even in the light most favorable to Defendants, did not amount to probable cause to arrest Barken for obstruction or obstruction by giving false information.[13]

### 4.1.4  Arguable Probable Cause

Having found that Sarenac, Vrtochnick, and Jankowski lacked probable cause for Barken's arrest, the Court must next determine if they had arguable probable cause, or a reasonable but mistaken belief that probable cause existed. *Williams*, 269 F.3d at 781 (citation omitted). Defendants concede that "Barken's constitutional right to be free from

---

[13]Because the Court concludes that, even viewing the facts and drawing all inferences favorably to Defendants, there was no probable cause, it need not reverse the analysis for purposes of considering Defendants' motion, because the outcome would be the same. *See Nucap*, 273 F. Supp. 3d at 997 ("[I]f summary judgment is not warranted, the court changes tack on the cross motion . . . ." (emphasis added and citation omitted)).

arrest without probable cause was clearly established at the time of the incident." ECF No. 78 at 13–14 (citing *Humphrey*, 148 F.3d at 725). Indeed, they make no effort to argue that the right at issue was not clearly established in a manner more specific to the facts of this case. The only case they cite for the proposition that arguable probable cause existed is *McComas*. *Id.* at 15–17 (discussing 673 F.3d 722).

As the Court already explained *supra* Section 4.1.3, *McComas* is distinguishable from this case on the facts. For this reason, *McComas* does not displace the Court's conclusion that probable cause was lacking, nor does it show that Sarenac, Vrtochnick, and Jankowski had arguable probable cause. Defendants do not otherwise elucidate why Sarenac, Vrtochnick, and Jankowski had a "mistaken belief" that probable cause existed when it did not; they simply argue that the record demonstrates that there was either probable cause or arguable probable cause. Having conceded the clearly-established prong of the qualified immunity analysis, Defendants have not attempted to distinguish why arguable probable cause existed even if probable cause did not. The Court will not develop Defendants' argument for them. Granting qualified immunity to Defendants is not appropriate.

### 4.2 Lawfulness of Barken's Continued Detention

The parties contest whether Barken's post-arrest detention was reasonable. ECF No. 73 at 4–10; ECF No. 78 at 17–22; ECF No. 82 at 13–16; ECF No. 91 at 31–32. "[T]he Fourth Amendment requires a judicial determination of probable cause as a requisite to extended restraint of liberty following arrest." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975). "[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, and for a brief

period of detention to take the administrative steps incident to arrest." *Id.* at 113–14. "When the 'administrative steps' have been completed, the police must take the suspect before a magistrate to establish probable cause, or they must let him go." *Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 437 (7th Cir. 1986).

Because the Court concluded *supra* Section 4.1.3 that there was no probable cause to arrest Barken, the Court need not complete the reasonableness analysis with respect to her post-arrest detention. "[I]nvoluntary transport to a police station for questioning . . . 'may constitutionally be made only on probable cause.'" *Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (quoting *Hayes v. Florida*, 470 U.S. 811, 816 (1985)); *see also United States v. Reed*, 349 F.3d 457 (7th Cir. 2003) ("Without probable cause to believe that a crime has been committed, the police may not simply seize a person and hope that over time and after 'reflection' the person decides to cooperate." (citing *Dunaway v. New York*, 442 U.S. 200, 218 (1979))). Barken's arrest without probable cause was a violation of the Fourth Amendment, so her subsequent detention was also unlawful.

Sarenac, Vrtochnick, and Jankowski committed the underlying unlawful arrest, raising the question of whether Gordon and Jordan remain appropriate Defendants in this case. Barken has raised a claim that each Defendant failed to intervene in the others' constitutional violations. ECF No. 14 at 19. There can be no unlawful detention claim against Gordon and Jordan on the basis that they failed to "independently assess probable cause" for Barken's continued detention. *Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1065 (E.D. Wis. 2015) (citing *Wood v. Worachek*, 618 F.2d 1225, 1232 (7th Cir. 1980)). Nonetheless, a Fourth Amendment claim may lie if they had "affirmative knowledge of the illegality of an individual's

continued detention and [were] either personally involved in continuing the detention or fail[ed] to intervene despite possessing that knowledge." *Id.* The parties have not briefed this issue so the Court will not decide this question at this juncture.

## 5.    CONCLUSION

For the reasons stated herein, the Court finds that Barken's arrest was not supported by probable cause and therefore was unlawful and in violation of the Fourth and Fourteenth Amendments, and consequently that her post-arrest detention was unlawful as well. The Court therefore grants Barken's motion for partial summary judgment and denies Defendants' motion for summary judgment.

This is not the end of the case. Plaintiff's failure-to-intervene claim remains, ECF No. 14 at 19; she needs to clarify the extent to which she will pursue this claim against each Defendant. Relatedly, Gordon and Jordan's liability for Barken's unlawful post-arrest detention claim, and therefore their role in the case moving forward (if any) is unclear; the parties may stipulate to dismiss these two Defendants or may wish to litigate their involvement through further written submissions. Additionally, Barken seeks compensatory and punitive damages as well as attorney's fees and costs. *Id.* at 21. Final judgment cannot be entered until Plaintiff's failure-to-intervene claim is in some capacity disposed of and further until the matter of damages is resolved. *See Horn v. Transcon Lines, Inc.*, 898 F.2d 589, 594 (7th Cir. 1990). The parties might resolve the matter of damages in out-of-court negotiations, mediation, further written submissions, or trial. Meanwhile, Defendants may file an interlocutory appeal on the denial of qualified immunity. *Est. of Davis v. Ortiz*, 987 F.3d 635, 639 (7th Cir. 2021) (citations omitted). As such, the Court will order that the parties file a joint

status update on or before **October 15, 2024** advising the Court as to the next step(s) they plan to take in this case, and what, if any, action from the Court is requested.

Accordingly,

**IT IS ORDERED** that Plaintiff Regina Barken's motion for partial summary judgment as to the unlawfulness of her arrest and post-arrest detention, ECF No. 70, be and the same is hereby **GRANTED**; Plaintiff's arrest was not supported by probable cause and therefore was unlawful and in violation of the Fourth and Fourteenth Amendments, and consequently her post-arrest detention was unlawful as well;

**IT IS FURTHER ORDERED** that Defendants Michael Sarenac, Kent Gordon, James Jordan, Raena Vrtochnick, and Troy Jankowski's motion for summary judgment, ECF No. 88, be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that, on or before **October 15, 2024**, the parties file a joint status update advising the Court as to the next step(s) they plan to take in this case, and what, if any, action from the Court is requested.

Dated at Milwaukee, Wisconsin, this 30th day of September, 2024.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge